# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**Billy Ray Lloyd, Jr.,**
**Petitioner Below, Petitioner**

**vs)  No. 16-1166** (Harrison County 15-C-191-3)

**Ralph Terry, Acting Warden,**
**Mt. Olive Correctional Complex,**
**Respondent Below, Respondent**

**FILED**

**March 14, 2018**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

In 2013, Petitioner Billy Ray Lloyd, Jr., broke into the home of an elderly woman at night armed with a knife, threatened to kill her, slashed her hand, and took cash and jewelry. He was charged with four felonies and ultimately pled guilty to first degree robbery and assault during the commission of a felony. In 2015, Petitioner filed an amended petition for writ of habeas corpus and raised an ineffective assistance of counsel claim. The Circuit Court of Harrison County denied relief, finding that Petitioner failed to demonstrate that counsel's representation fell below an objective standard of reasonableness under *Strickland v. Washington*, 466 U.S. 668 (1984). *See State v. Miller*, 194 W.Va. 3, 459 SE.2d 114 (1995) (adopting *Strickland* standard).

On appeal to this Court, Petitioner contends his trial counsel should have pursued an insanity defense because Petitioner's drug addiction was so severe that he was unable to conform his condut to the requirements of the law. Respondent Ralph Terry, Acting Warden, Mt. Olive Correctional Complex[1] (the "State"), counters that Petitioner's counsel acted objectively reasonable in all aspects of the underlying proceedings. Moreover, the State asserts that mere narcotics addiction, standing alone, cannot support an insanity defense.

The Court has considered the parties' briefs, oral argument, and the record on appeal.[2] We find no substantial question of law and no prejudicial error. Therefore, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the West Virginia Rules of Appellate Procedure.

---

[1] The warden at Mt. Olive Correctional Complex has changed to Ralph Terry, Acting Warden, and the Court has made this substitution of parties pursuant to Rule 41(c) of the West Virginia Rules of Appellate Procedure.

[2] Petitioner is represented by David Mirhoseini, Esq., and the State is represented by Erica N. Peterson, Esq.

1

# I. FACTUAL AND PROCEDURAL HISTORY
## A. The Crimes

On March 25, 2013, at approximately 10:00 p.m., Petitioner broke into the home of eighty-eight-year-old Mrs. Libby Stout, armed with a knife. He said "get the damn money, get the damn money you know where it is[,] you get it or I'm going to kill you[.]" During the altercation, the victim's hand was slashed with the knife and she suffered a deep laceration; there was blood on the floor and furnishings throughout the home. Petitioner took cash and jewelry that he later sold at a pawnshop. After Petitioner left, the victim called emergency services and she was taken to an area hospital.

Police officers obtained a statement from the victim at the hospital and she readily identified Petitioner as the perpetrator. She reported that Petitioner came "bursting into the house through the front door." The victim indicated that she did not know why Petitioner would do this to her as she was previously his landlord and thought they were friends. She feared for her life: "I thought surely he was going to kill me." The victim said Petitioner was "just going wild" and kept saying that he loved her. The officer asked why he would say that and the victim replied, "well he always said it" when he would visit her in the afternoon.

Police officers arrested Petitioner the following day. Police officers noticed a pickup truck parked at a local Go Mart. Petitioner was sitting in the vehicle as a passenger and his friend, Brian Yeager, was sitting in the driver's seat; Mr. Yeager's girlfriend, Tina Carroll, was using a payphone. On the way to jail, Petitioner stated, "boy when I do it, I do it big" and that "he just wanted to do his 15 years and be done with it." According to Petitioner, he committed the crimes because he was "homeless and needed drugs."

Mr. Yeager told police that he and his girlfriend picked up Petitioner at a local McDonald's and gave him a ride to the Go Mart. In exchange, Petitioner gave Mr. Yeager a ring. Mr. Yeager gave the police permission to search his vehicle, and they found a blue velvet bag that contained several pieces of the victim's jewelry. Mr. Yeager stated that before going to Go Mart, he and Petitioner went to a pawnshop. Petitioner told Mr. Yeager that he did not have any identification and needed Mr. Yeager to sell some jewelry.

## B. Indictments, Guilty Plea, and Sentence

A grand jury indicted Petitioner on four felony offenses: burglary, robbery in the first degree, assault during the commission of a felony, and grand larceny. Petitioner—who has an extensive criminal history—faced life imprisonment if he were convicted of these crimes and the State successfully pursued a recidivist information. The circuit court appointed an experienced criminal defense attorney, Jack Clark with the Harrison County Public Defenders' Office, to represent Petitioner.

Counsel entered into plea negotiations with the State at Petitioner's request. In June 2013, Petitioner pled guilty to one count of first degree robbery and one count of assault during the commission of a felony. In exchange, the State agreed to dismiss the two other felony charges, not file a recidivist information against Petitioner, and stand silent during sentencing.

During the plea hearing, Petitioner admitted to knowingly and purposefully robbing and assaulting Mrs. Stout, his friend and ex-landlord. Petitioner stated that he could not remember everything that happened but that he remembered taking jewelry and cutting her with the knife. He stated that he knew what he was doing was wrong but did it anyway. Petitioner stated that he was under the influence of bath salts. The circuit court asked Petitioner if he had "ever been treated or hospitalized for addiction to the use of any alcohol or drugs?" Petitioner responded in the affirmative and stated that he had on one occasion. Petitioner also stated that he had previously been diagnosed as "bipolar" but was not taking any medication for the condition. As part of the court's colloquy, Petitioner stated that he understood the various statutory penalties for each criminal conviction and for each count charged in the indictment. Petitioner confirmed that he felt counsel properly represented him and he was satisfied with the plea agreement.

Petitioner did not speak on his own behalf at the sentencing hearing.[3] The circuit court considered the presentence investigation report that included Petitioner's statement: "I was strung out on drugs and homeless. I needed drugs. My victim was not to be at home that night, so I went to get money and she was home." The report indicated Petitioner began using drugs at the age of thirteen and continued up through the present. In the eighteen-month period preceding the crimes, Petitioner regularly abused bath salts. Petitioner was evaluated at Sharpe Hospital in 2000, but no diagnosis was made. Petitioner's parents sent a letter to the court that addressed his history of substance abuse and loss of consciousness when under the influence.

---

[3] Counsel made the following statement at the sentencing hearing:

As the Court's probably aware, [Petitioner] has had virtually his entire adult life a problem with drugs. He's an admitted drug addict, and all of his crimes are laid out in the sentence investigation, the genesis of those crimes have been his dependence on drugs and his need to obtain drugs, whether it's to obtain money for drugs or his actions while he's on drugs. It's a battle that he's fought his entire life.
. . . .
What I can say in this instance, Your Honor, is that [Petitioner] has taken responsibility for his actions that occurred earlier this year, even so far as admitting to the police upon his arrest. He essentially confessed to what he had done. He came into Court, prodded me to get him a court date quickly because he knew that what he had done was wrong, and he kind of wanted to admit his guilt and take the consequences and try to put it behind him as best he could and as quickly as he could.
I can say on a personal level all of my interactions with [Petitioner] have been positive. He's been courteous and kind and he's been respectful to me, and that's certainly not something I can say of all of my clients.
[A]nd we're asking that he be sentenced to the Department of Corrections custody that at that facility he can get help that he needs. He can get drug treatment at a DOC facility.

The circuit court sentenced Petitioner to a determinate sentence of forty years for the conviction of robbery in the first degree and an indeterminate sentence of not less than two nor more than ten for the conviction of assault during the commission of a felony. The court ordered the sentences to run consecutively.

## C. Habeas Corpus Proceeding

In May 2015, Petitioner filed a pro se petition for writ of habeas corpus and advanced one ground, ineffective assistance of counsel. After he was appointed counsel, Petitioner filed an amended petition in August 2015.  The issue relevant here is Petitioner's assertion that his trial counsel was ineffective because he did not advise him of or pursue an insanity defense.

The circuit court conducted an omnibus hearing in October 2015. Petitioner, trial counsel, and Petitioner's stepmother testified. Counsel testified that he has practiced as a criminal defense attorney for approximately eleven years and has represented hundreds of clients. Counsel stated that he met with Petitioner approximately five times during the case and Petitioner explained his version of the events and admitted to the charges. Petitioner did not tell his counsel that he could not remember all of the details of the events but did say that he was under the influence of bath salts at the time of the crimes. Petitioner did not tell counsel that he was still under the influence at the time of the arrest or that he went through withdrawal during incarceration. Petitioner asked counsel to plead guilty at the preliminary hearing, but counsel explained that he could not plead that day but promised to speak to the prosecutor. After the preliminary hearing, counsel conducted an investigation, including reviewing the discovery in the matter, having several discussions with Petitioner, speaking with law enforcement, and speaking with Petitioner's mother. Prior to the plea hearing, counsel reviewed the plea agreement with Petitioner and went through it paragraph by paragraph. Counsel testified that he did not at the time, and still did not, believe that Petitioner had any affirmative defenses because "[Petitioner] knew what he was doing and was criminally responsible for his actions, and was taking responsibility for his actions." Counsel explained that he has had competency evaluations completed on clients in the past that he thought might not be competent to stand trial and/or to determine criminal responsibility as well. However, Petitioner "was always oriented as to time and place. He was always cooperative and able to fully engage with [counsel] in discussing the case. That led [counsel] to believe that [Petitioner] knew what he was doing. He knew what was going on, and [counsel] had no reason to believe that [Petitioner] was insane." Counsel stated that at no point, even to this day, has Petitioner claimed that he was so intoxicated on bath salts that he could not remember a thing about committing the crimes. Counsel stated that he was very concerned about recidivism in this case and it was "near the top of the list of things" to try to prevent.

Petitioner testified that he had injected approximately eight grams of bath salts into his neck prior to committing the crimes. He stated that counsel did not discuss with him the possibility of an insanity defense. Had he known about a possible insanity defense, he would want to withdraw his guilty pleas and go to trial on all four counts in the original indictment, even knowing that he would face the risk of the State filing a recidivist information against him and, ultimately, he would face a life sentence. Petitioner stated that he knew what he was doing was wrong at the time but testified that "to the best of his recollection" he could not stop himself. He stated that he believed at the time of the acts he was suffering from some kind of mental

problem that made him unable to stop himself. He discussed several instances of previous mental health issues that he at no point discussed with counsel, nor did he disclose them during the plea colloquy or at sentencing. Asked if he feels like he is mentally ill, Petitioner responded "[s]ometimes."

Petitioner's stepmother, Stephanie Lloyd, testified that she wrote a letter to the court *after* Petitioner was sentenced because she thought he received "a lot of time" considering his problems. About a month or two before the crimes, she and Petitioner's father discussed obtaining a mental hygiene petition on Petitioner following an incident when he was hallucinating. An ambulance came, but Petitioner refused to go get help. Mrs. Lloyd stated "he was really a mess." However, Mrs. Lloyd admitted that she never mentioned mental health concerns with Petitioner's counsel and did not speak at the sentencing hearing.

Petitioner presented no expert witness in the criminal defense field who criticized counsel's representation of Petitioner in any way, nor disputed counsel's opinion concerning the lack of a bona fide affirmative defense. Petitioner also presented no clinical or medical evidence demonstrating any mental disease or defect in support of his argument that he had a viable insanity defense.

The circuit court denied the petition and concluded trial counsel's conduct was reasonable considering the lack of evidentiary support for Petitioner's insanity defense claims. The court noted counsel was successful in negotiating a very beneficial plea for Petitioner.

## II. STANDARD OF REVIEW

Our standard of review in this matter is well established:

> In reviewing challenges to the findings and conclusions of the circuit court in a habeas corpus action, we apply a three-prong standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard; the underlying factual findings under a clearly erroneous standard; and questions of law are subject to a *de novo* review.

Syl. Pt. 1, *Mathena v. Haines*, 219 W.Va. 417, 633 S.E.2d 771 (2006).

## III.  DISCUSSION

Petitioner's ineffective assistance claim is uncomplicated. He contends that his trial counsel was ineffective in two ways—first, for not investigating the possibility of an insanity defense, and second, for not informing him of this defense. Petitioner asserts that, absent his counsel's alleged ineffectiveness, he would have proceeded to trial.

"The right to counsel is a fundamental right of criminal defendants; it assures the fairness, and thus the legitimacy, of our adversary process." *Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986). The United States Supreme Court has recognized that "the right to counsel is the right to the *effective* assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n.14

(1970) (emphasis added). As the Court explained in *Strickland*, however, whether counsel is effective or ineffective does not turn on the defendant's subjective pleasure or displeasure with counsel's performance. There are two essential elements to a successful claim of ineffective assistance of counsel:

> *First*, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. *Second*, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. at 687 (emphasis added); *see* Syl. Pt. 5, *Miller*, 194 W.Va. 3, 459 S.E.2d 114 (adopting two-pronged *Strickland* test).

The *Strickland* test applies to the alleged ineffectiveness of Petitioner's counsel in connection with the plea hearing as well as the sentencing stage of the proceedings. *Hill v. Lockhart*, 474 U.S. 52, 58 (1985).

A defendant bears a "highly demanding" burden when seeking to establish an ineffective assistance of counsel claim. *Kimmelman*, 477 U.S. at 383. The extent of Petitioner's burden is evident when one analyzes the United States Supreme Court's language in *Strickland* and its progeny explaining each of the components: deficient performance and prejudice. With respect to the former, the *Strickland* Court stated:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence [or guilty plea], and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'

466 U.S. at 669 (emphasis added).

Concerning the "prejudice" element, a "defendant must show that there is a probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. In other words, deficient performance, by itself, "does not warrant setting

aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691. A reviewing court, moreover, may not focus solely on "outcome determination," i.e., whether the result would have been different but for counsel's errors. *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993). Rather, the court on review must make an additional determination that the actual result of the proceeding was "fundamentally unfair or unreliable." *Id*.

With the rigorous nature of the *Strickland* test firmly in mind, we address Petitioner's arguments.

### A. Petitioner Has Not Established Deficient Performance

Petitioner claims that several factors, including the victim's statement concerning his bizarre behavior during the crime, his admission to ingesting bath salts just prior to the crime, his statement that he could not recall large portions of the crime's commission and his history of mental health issues and substance abuse, all indicate that an insanity defense may have been viable. Despite these indications, he complains that counsel failed to undertake an investigation of this defense.

Petitioner and the State devote much of their briefs to the issue of whether Petitioner even had a valid insanity defense. Petitioner argues that he could have advanced this defense because he was in the "powerful grip" of a long-term and chronic drug addiction when he committed the crimes and despite knowing they were wrong, he was unable to stop himself.[4] The State counters that Petitioner lacked a plausible insanity defense because evidence of mere narcotics addiction—standing alone and without other physiological or psychological involvement—raises no issue of a mental defect or disease that can serve as a basis for that defense.[5]

In *Grayson v. Thompson*, 257 F.3d 1194 (11th Cir. 2001), the petitioner advanced an argument substantially similar to the one Petitioner makes here. Grayson argued that his trial lawyer was ineffective for failing to develop evidence regarding his chronic alcoholism and intoxication at the time of the offense. The court advised that although the petitioner's claim was that his trial counsel *should have* done something more, the inquiry under the performance prong

---

[4] *See* Syl. Pt. 5, *State v. Massey*, 178 W.Va. 427, 359 S.E.2d 865 (1987) ("'When a defendant in a criminal case raises the issue of insanity, the test of his responsibility for his act is whether, at the time of the commission of the act, it was the result of a mental disease or defect causing the accused to lack the capacity either to appreciate the wrongfulness of his act or to conform his act to the requirements of the law. . . .' Syllabus Point 2, in part, *State v. Myers*, 159 W.Va. 353, 222 S.E.2d 300 (1976).").

[5] *See United States v. Lyons*, 731 F.2d 243, 245 (5th Cir. 1984) ("Today the great weight of legal authority clearly supports the view that evidence of mere narcotics addiction, standing alone and without other physiological or psychological involvement, raises no issue of such a mental defect or disease as can serve as a basis for the insanity defense.").

of *Strickland* was limited to whether the course of action followed by defense counsel was a reasonable one. *Id*. at 1218-19. We agree.[6]

Before addressing what counsel actually did do by way of investigation, we initially must consider what constitutes the "duty to investigate" under controlling case law. *Strickland* itself involved, among other things, a claim that the defendant's lawyer had been ineffective for failing to request a psychiatric examination of his client. Consequently, *Strickland* has a good deal to say about the "duty to investigate" both generally and in the specific context of a possible insanity defense:

> [S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgements support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgements.

> [W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.

*Strickland*, 466 U.S. at 691 (emphasis added).

Although counsel did not request a mental evaluation of Petitioner before recommending the plea, there was nothing to suggest that this inquiry was appropriate at this stage of the proceeding. Counsel did not observe any unusual or suspect behavior on the part of his client that would warrant further inquiry into Petitioner's mental state because any unusual behavior Petitioner exhibited during the crimes could reasonably be attributed to intoxication. We note that counsel was an experienced criminal defense attorney who met with Petitioner on several occasions prior to the guilty plea and had ample opportunity to observe and assess Petitioner's demeanor.

Moreover, contrary to Petitioner's assertions, there was very little reason for counsel to explore an insanity defense during subsequent proceedings. At the plea hearing, Petitioner first mentioned that he had been diagnosed as "bipolar." However, he did not elaborate on when this diagnosis was made or by whom, but stated he was not on medication. At the sentencing hearing, the presentence report indicated, without elaboration, that "[t]he defendant reports being

---

[6] *See* Syl. Pt. 4, *State ex rel. Daniel v. Legursky*, 195 W.Va. 314, 465 S.E.2d 416 (1995) ("In determining whether counsel's conduct falls within the broad range of professionally acceptable conduct, this Court will not view counsel's conduct through the lens of hindsight. Courts are to avoid the use of hindsight to elevate a possible mistake into a deficiency of constitutional proportion. Rather, under the rule of contemporary assessment, an attorney's actions must be examined according to what was known and reasonable at the time the attorney made his or her choices.").

evaluated at Sharpe Hospital in 2000, but states there was no diagnosis made." Therefore, Petitioner's central premise—that he was unable to conform his acts to the requirements of the law—lacks evidentiary support other than his self-serving testimony.

Petitioner argues that the facts of the instant case are analogous to *Becton v. Barnett*, 920 F.2d 1190 (4th Cir. 1990), wherein he claims the court "had no difficulty finding and concluding that defense counsel's performance was constitutionally ineffective under both prongs of a *Strickland* analysis" when counsel failed to pursue an insanity defense. Petitioner is mistaken; this case is plainly inapposite. First, Petitioner misinterprets the holding in *Becton*, as the court simply held that the petitioner presented colorable claims of ineffective assistance thus requiring the lower court to conduct an evidentiary hearing. Second, the facts of *Becton* are patently distinguishable. Unlike Petitioner, Becton had documented evidence of an extensive history of psychiatric treatment; he was admitted to mental wards off and on for years after experiencing auditory hallucinations, suicidal thoughts, and "exhibiting strange behavior including walking like a chicken and barking like a dog." *Id.* at 1191. Becton was diagnosed with paranoid schizophrenia and was placed on different medications. *Id.* Moreover, Becton advised counsel before trial that he had been in and out of mental hospitals prior to his arrest *and* asked counsel to send him to be evaluated to determine if he was competent to stand trial. *Id.*

A more comparable ineffective assistance of counsel claim was addressed, and rejected, in *Evans v. Meyer*, 742 F.2d 371 (7th Cir. 1984). The court found Evans was not entitled to an evidentiary hearing to determine whether his counsel's failure to advise him of a possible defense of intoxication constituted ineffective assistance of counsel. The court recognized that "[i]t is not the normal practice of lawyers to advise their clients of every defense or argument or tactic that while theoretically possible is hopeless as a practical matter." *Id.* at 374. The court reasoned that under the facts presented, "no lawyer in his right mind would have advised Evans to go to trial with a defense of intoxication, especially when he could if convicted on all charges have been sentenced to 120 years in prison." *Id.*

Considering the foregoing, we refuse to hold that counsel's performance was deficient because he failed to investigate an insanity defense or advise Petitioner that he may theoretically be able to advance this defense.[7] "[I]f it is reasonable in the circumstances not to conduct a particular investigation, [a] lawyer's failure to do so will not establish ineffective representation." *Earl v. Israel*, 765 F.2d 91, 93 (7th Cir. 1985), *cert. denied*, 474 U.S. 951 (1985). The fact that an insanity defense may have been the only defense available to Petitioner does not change our analysis, for if there is no bona fide defense to a charge, "counsel cannot create one and may disserve the interests of his client by attempting a useless charade." *United States v. Cronic*, 466 U.S. 648, 656 n.19 (1984).

---

[7] Petitioner states counsel was "clueless as to what an insanity defense under West Virginia law entailed." Petitioner grossly exaggerates counsel's testimony. Counsel testified that he did have psychological examinations performed on clients to determine competency and/or criminal responsibility when the facts supported that inquiry. However, because there was no reason to question Petitioner's sanity, he did not spend time in preparation of that defense and was therefore unprepared to answer specific questions on that topic. If that had been an issue in the case, counsel stated that he would have "properly educated" himself.

9

Petitioner's counsel was faced with the formidable task of defending a client who had committed violent crimes against an elderly woman in her home. The State had near conclusive proof of guilt on all charges. Making the situation more onerous were the facts that Petitioner was a drug addict with a long history of criminal convictions. After conducting an appropriate investigation, counsel recognized that Petitioner's crimes were fueled by his drug addiction and he saw no legitimate reason to investigate or pursue an insanity defense. It was clear that had Petitioner gone to trial, given these facts and the shocking nature of the crimes, he would likely have been convicted of all four felonies charged. Then, a recidivist proceeding would likely have resulted in a life sentence. Given these circumstances, a reasonable lawyer would have acted as counsel did and recommended the plea.

Because Petitioner does not satisfy the first prong of *Strickland*, we are not required to address the second prong. However, as we discuss below, even if we assume for the sake of argument that counsel's performance was deficient, Petitioner has not established prejudice.

### B. Petitioner Has Not Established Prejudice

With regard to the prejudice prong of *Strickland*, Petitioner must demonstrate "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Syl. Pt. 6, in part, *State ex rel. Vernatter v. Warden, W.Va. Penitentiary*, 207 W.Va. 11, 528 S.E.2d 207 (1999). Moreover, Petitioner must "convince the court that a decision to reject the plea bargain would have been rational under the circumstances." *Padilla v. Kentucky*, 559 U.S. 356, 372 (2010). A "defendant's mere allegation that he would have insisted on trial but for his trial counsel's errors, although necessary, is ultimately insufficient to entitle him to relief. Rather, we look to the factual circumstances surrounding the plea to determine whether defendant would have proceeded to trial." *United States v. Clingman*, 288 F.3d 1183, 1186 (10th Cir. 2002) (brackets, citation, and internal quotation marks omitted); *see Hill*, 474 U.S. at 59. And where, as here, "the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the 'prejudice' inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial." *Id*. at 59.

Under the facts developed below, Petitioner cannot meet this burden. With damning evidence against him, no plausible insanity defense, and facing a possible life sentence, Petitioner cannot demonstrate that a decision to reject the plea bargain would have been rational under the circumstances. *See Rhinehart v. State*, 290 P.3d 921 (Utah 2012) (concluding defendant's assertions that she was coerced into pleading guilty were unavailing because she could not demonstrate that going to trial would have been rational under circumstances considering weight of evidence against her). Moreover, Petitioner cannot establish that the underlying proceeding was "fundamentally unfair or unreliable." *Lockhart*, 506 U.S. at 369. Accordingly, the circuit court correctly concluded that Petitioner was not prejudiced.

## IV.  Conclusion

Petitioner failed to establish that his trial counsel rendered deficient performance. Therefore, the December 5, 2016, amended order of the Circuit Court of Harrison County is affirmed.[8]

Affirmed.

**ISSUED:**  March 14, 2018

**CONCURRED IN BY:**

Chief Justice Margaret L. Workman
Justice Robin Jean Davis
Justice Menis E. Ketchum
Justice Allen H. Loughry II
Justice Elizabeth D. Walker

---

[8] The amended order corrected errors in the circuit court's original order denying habeas relief entered November 18, 2016.